IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>JOSE LUIS GALLARDO,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:04-CR-632 TC |

Defendant Jose Luis Gallardo has been indicted on charges (two counts) of possession of a controlled substance (cocaine and methamphetamine) with intent to distribute (21 U.S.C. § 841(a)(1)).  Mr. Gallardo has filed a Motion to Suppress evidence obtained in connection with a Utah Highway Patrol Trooper's September 9, 2004 warrantless traffic stop, search, and questioning of Mr. Gallardo and the stop and search of the sport utility vehicle ("SUV") Mr. Gallardo was driving.

Mr. Gallardo contends that the evidence must be excluded because the highway trooper's detention of Mr. Gallardo exceeded the scope of the initial traffic stop,[1] Mr. Gallardo's consent to search the SUV was not voluntary, and the warning given to Mr. Gallardo, as required by Miranda v. Arizona, 384 U.S. 436 (1966), was defective.  The United States asserts that Mr. Gallardo does not have standing to challenge the search of the SUV.  Moreover, the United

---

[1]Mr. Gallardo does not challenge the validity of the traffic stop itself.

States contends that the highway trooper had reasonable suspicion to detain and question Mr. Gallardo, that Mr. Gallardo's consent to search was voluntary, and that the <u>Miranda</u> warning given to Mr. Gallardo met all the substantive requirements necessary to satisfy the law.

For the reasons discussed below, the court GRANTS IN PART AND DENIES IN PART Mr. Gallardo's Motion to Suppress.

## FINDINGS OF FACT

Utah Highway Patrol Sergeant David Bairett is a twelve-year veteran of his department. (Apr. 14, 2005 Evidentiary Hearing Transcript (hereinafter "Tr.") at 4.)  He is certified in the Police Officer Standards & Training ("POST") and has attended many classes over the years on drugs and drug interdiction. (Tr. at 5.)  Sergeant Bairett has made hundreds of drug arrests and is very familiar with the typical characteristics associated with "drug couriers." (Tr. at 6.)  Sergeant Bairett's training and experience with drug interdiction prompt him to look for the following characteristics while conducting any traffic stop: observably extreme and abnormally nervous behavior; vehicles owned and registered to third parties, who are often unknown to the suspect; marked routes; presence of cellular phone and other communication devices; and incoherent or aberrant relation of travel plans and itineraries. (Tr. at 6.)

On the morning of September 9, 2004, Sergeant Bairett was patrolling a portion of Interstate 15 (I-15) near the town of Beaver, Utah, when he saw a "light colored Ford Expedition" with "very dark window tint" and California license plates traveling north on I-15. (Tr. at 7; Gov't Ex. 3.)  Noting the extremely dark tinting on the SUV's windows, Sergeant

Bairett stopped the SUV because it appeared to be in violation of Utah's window tint law.[2]  (Tr. at 8-9, 19-20, 35-38.)

Sergeant Bairett walked to the passenger side window of the SUV and asked the driver for his driver's license, vehicle registration, and proof of insurance.[3]  (Tr. at 9-11.)  The driver (Mr. Gallardo) responded that he did not have proof of insurance, but he did produce a vehicle registration, which listed a third party as the owner of the SUV, and a driver's license from Michoacan, Mexico.[4]  (Tr. at 11; Gov't Ex. 1.)  No one else was in the SUV.

Over the years, Sergeant Bairett, as a Utah Highway Patrol trooper, has seen several Mexican driver's licenses, including those issued in Michoacan, Mexico.  (Tr. at 42.)  Although the driver's Mexican license had not yet expired, Sergeant Bairett suspected that Mr. Gallardo's license was invalid because it lacked official signals (such as a hologram) and because Mr. Gallardo told the trooper that he was a resident of Kansas.  (Tr. at 11, 24-25, 43, 46-47.)  Mr. Gallardo later clarified that he was a resident of Kansas City, Missouri, but, upon questioning, he did not know the zip code for his own home.  (Tr. at 20-22.)

When Sergeant Trooper asked Mr. Gallardo about the SUV registration listing a third party as owner, Mr. Gallardo said his brother's friend's girlfriend owned the SUV and loaned it to him, but he did not know the owner's name.  (Tr. at 14.)  When Sergeant Bairett asked Mr.

---

[2]Utah's window tint law is set forth at Utah Code Ann. § 41-6a-1635 (2005) (formerly numbered as 41-6-149).  Mr. Gallardo does not contest the validity of Sergeant Bairett's initial reason for making the stop.

[3]The entire traffic stop was recorded on videotape by a camera mounted inside the trooper's car.  (See Gov't Ex. 2.)

[4]The name on the driver's license was Jose Funes Vargas.  (See Gov't Ex. 1.)

Gallardo whether he knew his brother's phone number, Mr. Gallardo said he did not and he did

not have the number programmed into his cellular phone.  (Tr. at 20.)

When asked about his travel plans, Mr. Gallardo told Sergeant Bairett that he was driving

to Kansas to visit family.  (Tr. at 19.)  He said he had made two trips to California from Kansas

in the past month, and that on his earlier return trip to Kansas his truck had broken down in

Richfield, Utah, that he had left the truck there, and had taken an Amtrak train from Kansas City

to California (the record does not reveal how Mr. Gallardo got from Richfield to Kansas City).

(Tr. at 22-23.)  When Sergeant Bairett asked Mr. Gallardo how the owner of the SUV was going

to get it back, Mr. Gallardo said that his brother, his brother's friend, and his brother's friend's

girlfriend were going to fly out to get the SUV back.  (Tr. at 23.)  Given Sergeant Bairett's drug

interdiction training and experience with drug couriers, Sergeant Bairett found it suspicious that

Mr. Gallardo made multiple trips from Kansas to California in one month and that Mr. Gallardo

showed so little interest in the truck that had broken down in Richfield just weeks before this

traffic stop.  (Tr. at 23.)  He also found it suspicious that the alleged owner of the SUV would

incur the expense of flying across the country to reclaim her own property.  (Tr. at 24.)

Sergeant Bairett testified that when Mr. Gallardo first handed him the registration and

driver's license, Mr. Gallardo was visibly shaking[5] and seemed extremely nervous, beyond the

---

[5]The court has determined, upon reviewing the videotape, that the visual evidence of
shaking is inconclusive given the quality of the tape.  Nevertheless, Sergeant Bairett, a witness
the court found very credible, testified that Mr. Gallardo was visibly shaking.  In fact, Sergeant
Bairett specifically states on the videotape that "the subject's hands are shaking."  (See Gov't Ex.
2 (videotape) at 9:24:41 to 9:24:46.)

level of nervousness consistent with a routine traffic stop.[6]  (Tr. at 14-15; Gov't Ex. 2 (videotape) at 9:24:44.)  Later during the stop, Sergeant Bairett asked for and received permission to do a pat-down of Mr. Gallardo to check for weapons.[7]  (Tr. at 17-18.)  Sergeant Bairett observed that, during the pat-down, Mr. Gallardo's "whole entire body was shaking.  He was trembling all over."[8]  (Tr. at 27.)

During the stop, Sergeant Bairett asked Utah Highway Patrol dispatch to run the name on the driver's license ("Jose Funes Vargas" according to the Mexican license) and SUV license plate number through Kansas and California databases.  (Tr. at 25.)  Dispatch reported that "they could not find any information on the subject out of either Kansas or California, and they gave me the registered information on the vehicle and advised that it was not listed as stolen."  (Id.)  Dispatch provided some physical descriptions of a "Jose Vargas" but none matched Mr. Gallardo's description.  (Id.)  Sergeant Bairett, based on his observations, believed that "something criminal was going on." (Tr. at 56.)  Sergeant Bairett said that even though Mr. Gallardo was not under arrest at this point, Sergeant Bairett wanted to investigate further given his suspicions.  (See Tr. at 56, 59.)

> Based upon [Mr. Gallardo's] nervous behavior, his story about where he was going, where he was coming from, how long he was there, how he got there, how he was getting to where he was going, how the owner was going to reacquire their vehicle, who the owner was, how he came in contact with that, who his brother

---

[6]Sergeant Bairett testified that, in his experience (including more than 15,000 traffic stops over twelve years), a typical driver's level of nervousness usually tends to dissipate after initial contact and further discussion throughout the course of the traffic stop.  (Tr. at 51.)

[7]Mr. Gallardo does not challenge the validity of the pat-down.

[8]The pat-down was done off camera, so the court could not observe one way or the other whether Mr. Gallardo was visibly shaking.

was, and the fact that he didn't even know his brother's telephone number.  The
whole story just didn't seem plausible to me.

(Tr. at 60.)

After Sergeant Bairett returned Mr. Gallardo's papers and gave Mr. Gallardo a warning

citation for violation of the Utah window tint law and lack of a valid driver's license, Mr.

Gallardo asked if he could go to the next town (approximately seven miles away) to get the

window tinting removed.  (Tr. at 56.)  Sergeant Bairett testified that he was concerned about the

absence of proof of insurance on the SUV and the validity of Mr. Gallardo's driver's license, and

responded to Mr. Gallardo's question as follows: "How are you going to drive?  You don't have

a driver's license."  (Tr. at 27-28.)  When Sergeant Bairett was asked by counsel whether Mr.

Gallardo was free to go at that point, the following clarifying colloquy occurred during the

evidentiary hearing:

> The Court: . . . Let me just ask you this, officer.  If he [Mr. Gallardo] had started
>
> off, isn't it fair to say you'd have stopped him?
>
> THE WITNESS [Sergeant Bairett]:  Yes. I think it is.
>
> The Court:  I think I find probably he wasn't free to leave.

(Tr. at 61.)

Sergeant Bairett then asked Mr. Gallardo whether there were weapons or drugs in the

SUV.  (Tr. at 28-29.)  After this exchange with Mr. Gallardo (who denied the presence of drugs,

but in a fashion that made Sergeant Bairett even more suspicious – i.e., averting his eyes),

Sergeant Bairett asked for permission to search the SUV.  (Tr. at 29.)  Mr. Gallardo said "Yes."

(Id.; Gov't Ex. 2 (videotape) at 9:35:00 to 9:35:05.)

6

During the search, Sergeant Bairett found packages of what appeared to be illegal drugs and arrested Mr. Gallardo.  (Tr. at 30-31.)  Sergeant Bairett gave Mr. Gallardo his <u>Miranda</u> warning from memory, advising Mr. Gallardo of his rights as follows:

> You do have the right to remain silent.  Anything you say can and will be used against you in court.  You have the right to an attorney.  You have the right to have that attorney with you during questioning.  If you give up your right to remain silent and choose to answer questions, you may stop answering those questions at any time.  Also, you may request counsel at any time during questioning.

(Gov't Ex. 2 (videotape) at 9:49:03-35.)  After being advised of his rights, Mr. Gallardo responded affirmatively that he understood his rights and that he was willing to answer questions. (Tr. at 31-32; Gov't Ex. 2 (videotape) at 9:49:35-46.)  Sergeant Bairett asked various questions and continued his search, which ultimately produced three pounds of methamphetamine and two-and-one-quarter pounds of cocaine.  (Tr. at 32, 34.)  When Sergeant Bairett delivered Mr. Gallardo to the nearby jail, he told Utah Bureau of Investigation Agent Brent Dunlap and Utah Highway Patrol Trooper Ryan Bauer that Mr. Gallardo had already been given his <u>Miranda</u> rights.  (Tr. at 33.)  Mr. Gallardo answered further interrogative questions posed to him by officers at the jail.  (Tr. at 67-69.)  Apparently no other <u>Miranda</u> warnings were given.

## CONCLUSIONS OF LAW

### <u>Does Mr. Gallardo Have Standing to Challenge the Search of the SUV?</u>

The government contends that Mr. Gallardo lacks standing to challenge the search of the SUV "because he failed to meet his burden of proof in establishing that he had a legitimate possessory interest in, or a lawful control over, the vehicle."  (United States' Response to Def.'s

Mot. To Suppress Evidence at 8.)[9]

The Tenth Circuit recognizes that "Fourth Amendment rights are personal and cannot be claimed vicariously." United States v. Valdez Hocker, 333 F.3d 1206, 1208 (10th Cir. 2003). In this case, where Mr. Gallardo was not the owner of the SUV and is challenging the search of the SUV, he has the burden to prove that he has standing, i.e., that he had a legitimate possessory interest in or lawful control over the car at the time of the search. Id. at 1209. "Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." Id.

Instead, the court must evaluate three factors to determine whether Mr. Gallardo has standing: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." Id. Here, Mr. Gallardo did not testify during the suppression hearing, so that factor does not add to the analysis (i.e., there is no evidence in the record regarding Mr. Gallardo's expectation of privacy). The only evidence the court has is the testimony of Sergeant Bairett and the videotape of the traffic stop, which includes a recording of some of Mr. Gallardo's statements (or Sergeant Bairett's repeat of those statements). The fact that this evidence was presented by the United States rather than Mr. Gallardo seems beside the point. Certainly Mr. Gallardo is allowed to rely on the evidence in the record, regardless of its source.

---

[9]No issue has been raised regarding Mr. Gallardo's standing to challenge his own detention and interrogation, both of which implicate his personal rights.

There is no question that Mr. Gallardo was in possession of and had control over the SUV.  But the United States contends that is not enough to establish standing.  The United States cites to Valdez Hocker, which provides that "mere possession of the car and its keys does not suffice to establish a legitimate possessory interest."  Id.  The United States also distinguishes United States v. Soto, 988 F.2d 1548 (10th Cir. 1993), upon which Mr. Gallardo relies to support his contention that he has standing.  According to the government, "In Soto, unlike in the present case, the defendant knew the owner's name, told the officer that name, and then produced vehicle registration bearing that same name."  (United States' Response to Def.'s Mot. To Suppress Evidence at 10.)  The difference in this case is that Mr. Gallardo did not know the specific name of the owner, so he was not able to tell Sergeant Bairett her name.  He did, however, present a valid registration and identified the owner by her status, just not by her name.  Also, as evidenced by the videotape of the stop, the computer check on the SUV did not reveal any evidence that the SUV was stolen.  (See Gov't Ex. 2 (videotape) at 9:30:40 to 9:31:50.)  Nothing in the record contradicts Mr. Gallardo's statements to Sergeant Bairett during the traffic stop.

Although it is a close question regarding whether Mr. Gallardo has satisfied his burden, the court finds that Mr. Gallardo has standing to challenge the search of the SUV.[10]  See Soto, 988 F.2d at 1553 ("Although [the] evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car.").

---

[10]The court also notes that Mr. Gallardo's personal luggage was searched and that is where at least some of the illegal drugs were found.  It seems that he would have standing to challenge that search regardless.

**Was Sergeant Bairett's Continued Detention of Mr. Gallardo Based on Reasonable Suspicion?**

Although Mr. Gallardo does not challenge the initial traffic stop, he contends that his continued detention by Sergeant Bairett was unlawful.  Accordingly, he argues, the unlawful detention tainted Mr. Gallardo's consent to search the SUV and any evidence obtained during the search of the SUV must be excluded as fruit of the poisonous tree.  The United States, on the other hand, contends that Sergeant Bairett's actions did not extend beyond the scope of the initial stop, and, even if they did, Sergeant Bairett had an objectively reasonable articulable suspicion of criminal activity that made the extended detention and subsequent search lawful.

In the Tenth Circuit, because a traffic stop is analogous to an investigatory detention, it is analyzed under the principles of Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005).  Accordingly, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  As noted earlier, the parties do not dispute that the initial traffic stop was justified at its inception.  The question is whether Sergeant Bairett's actions during the stop were reasonably related in scope to the circumstances which justified the initial stop, and, to the extent such actions went beyond the scope of the circumstances justifying the initial stop, whether the officer had reasonable articulable suspicion that illegal activity had occurred or was occurring.  Williams, 403 F.3d at 1206.

Generally, in a routine traffic stop, an officer may detain persons for only as long as it takes to request an operator's license and vehicle registration, run required computer checks, and

10

issue a citation.  See, e.g., United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992) (citing

United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir 1988), overruled on other grounds,

United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995)).  It is undisputed that "an officer

may ask questions relating to the reason for the stop."  Holt, 264 F.3d at 1221.  Nevertheless,

"[a]n officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an

objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver

voluntarily consents to further questioning."  Williams, 403 F.3d at 1206.  The government bears

the burden of showing that the seizure of Mr. Gallardo "was sufficiently limited in scope and

duration to satisfy the conditions of an investigative seizure."  Florida v. Royer, 460 U.S. 491,

500 (1983), quoted in United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994).

    The standard for evaluating whether an officer has a reasonable suspicion of illegal

activity is an objective one.  See, e.g., United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th

Cir. 1997).  The court must look at the totality of the circumstances to determine whether

Sergeant Bairett had a "particularized and objective basis for suspecting legal wrongdoing."

United States v. Arvizu, 534 U.S. 266, 273 (2002).[11]  By definition, the totality of the

circumstances includes all circumstances known to the officer at the time, as well as reasonable

inferences and conclusions that may be drawn by the officer.  Moreover, in determining

reasonableness, the officer's conduct should be viewed with "'common sense' considering

'ordinary human experience,'"  Villa-Chaparro, 115 F.3d at 801  (quoting United States v.

---

[11]The court finds that the encounter between Mr. Gallardo and Sergeant Bairett was not a
consensual encounter, so the government may not rely on that basis to justify the continued
detention of Mr. Gallardo.

Sharpe, 470 U.S. 675, 685 (1985)), an approach "intended to avoid unrealistic second-guessing of police officers' decisions and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  Villa-Chaparro, 115 F.3d at 801 (quoting United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995)); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them").

In sum, law enforcement officers are not required to turn a blind eye to an aggregate of circumstances which, in their training and experience, present the likelihood, or even the significant possibility, of illegal activity.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998); United States v. Guitierrez-Daniez, 131 F.3d 939 (10th Cir. 1997); United States v. Wood, 106 F.3d 942 (10th Cir. 1997).  Rather, they may take such reasonable investigative steps as necessary to confirm or dispel their suspicions, and the subjects may be detained while these steps are being taken.  United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992).

Sergeant Bairett's activities during the initial stop were reasonably related to the purposes of the stop and so were justified.  During the initial stop, Sergeant Bairett asked for Mr. Gallardo's identification, vehicle registration, and proof of insurance.  He then asked questions regarding the SUV's registration and the name of the owner as it appeared on the registration, particularly because it was not the driver's name.  Sergeant Bairett then asked Mr. Gallardo to accompany him to his patrol car, where he asked Mr. Gallardo questions about his home address and his travel plans while he was in the process of issuing a warning citation for the window tint violation and lack of a valid driver's license.  Sergeant Bairett attempted to verify the vehicle

12

registration and the driver's identity through computer checks and then completed the warning citation. Finally, Sergeant Bairett got out of the patrol car with Mr. Gallardo, gave Mr. Gallardo the citation, returned Mr. Gallardo's documentation, and asked whether Mr. Gallardo had any questions about the citation. None of these activities was in any way beyond the scope of the initial stop. It is well established that during the course of any given traffic stop, an officer may "request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. The detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle." United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003) (internal citations and quotation marks omitted). Sergeant Bairett was entitled to ask the questions that he did during the initial traffic stop, and therefore, any questioning he did along those approved lines cannot turn the initial traffic stop into an unlawful detention or otherwise taint Mr. Gallardo's later consent to the search the SUV.

Even if Sergeant Bairett's questions went beyond the scope of the initial stop, Sergeant Bairett had an objectively reasonable and articulable suspicion that illegal activity was occurring, and so was justified in extending the traffic stop. Throughout the stop, Sergeant Bairett observed a number of suspicious circumstances, the totality of which gave him cause to suspect that criminal activity, specifically drug trafficking, had occurred, or was occurring. Mr. Gallardo could not produce proof of insurance for the SUV. Because the license lacked official markings and because Mr. Gallardo presented a Mexican driver's license while claiming to be a long-time resident of Kansas City, Missouri, Sergeant Bairett did not believe that Mr. Gallardo had a valid driver's license. Sergeant Bairett thought it odd that Mr. Gallardo did not know the SUV owner's name. He also found it suspicious that Mr. Gallardo said he had made multiple trips to

13

California from Kansas within a month, that Mr. Gallardo did not seem to know or care what became of his broken-down truck, and that the SUV's owner (along with two other individuals) would incur the expense of flying across the country to pick up the SUV.

In addition, Sergeant Bairett testified that Mr. Gallardo was extremely nervous beyond levels normally encountered in individuals he has stopped. He testified that Mr. Gallardo was trembling throughout the entire traffic stop. Sergeant Bairett assessed Mr. Gallardo's nervousness based on his experience observing various levels of nervousness. Indeed, Sergeant Bairett testified that in his experience, in the case of a routine traffic stop, the person's nervousness level tends to dissipate after initial contact and further discussion throughout the traffic stop. Mr. Gallardo's nervousness did not dissipate at all, according to Sergeant Bairett. After assessing the totality of these factors, a reasonable person with Sergeant Bairett's training and experience would reasonably suspect, as did Sergeant Bairett, that "something criminal was going on." Accordingly, the detention of Mr. Gallardo was lawful.[12]

**Was Mr. Gallardo's Consent to Search the SUV Voluntary?**

Mr. Gallardo apparently contends that the search was unlawful because the detention was unlawful. He does not challenge the scope of the search. He does not suggest that he refused to give consent or that his affirmative response to Sergeant Bairett's request to search the SUV was coerced. Rather, he says the detention (which he calls a "de facto arrest") "tainted" the consent to search.

---

[12]The court disagrees with Mr. Gallardo's contention that "the investigative stop based upon reasonable suspicion matured into a de facto arrest when [Mr. Gallardo] was not 'free to leave'." (See Def.'s Mem. in Supp. of Mot. to Suppress at 18.)

The burden is on the government to establish voluntariness of a consent to search by clearly demonstrating that the consent was unequivocal, specific, freely and intelligently given, and that the consent was not the product of duress or coercion.  United States v. Orrego-Fernandez, 78 F.3d 1497, 1505 (10th Cir. 1996).  "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'"  Ohio v. Robinette, 519 U.S. 33, 40 (1996) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)).

In the present case, there is sufficient evidence to support the voluntariness of the consent given by Mr. Gallardo.  Sergeant Bairett's specific request was met with the unequivocal affirmative response of "Yes."  (See Gov't Ex. 2 (videotape) at 9:35:00 to 9:35:05.)  At the time consent was granted, Mr. Gallardo was not physically restrained, and no threats, intimidation or show of force were used by Sergeant Bairett.  As discussed above, Mr. Gallardo was not unlawfully detained and Sergeant Bairett had reasonable articulable suspicion to request permission to search the SUV.

The fact that Mr. Gallardo was not free to leave after Sergeant Bairett returned the license and registration to Mr. Gallardo does not change the court's analysis.  A valid consent to search may be given by a person who is being detained.  United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996); United States v. Soto, 988 F.2d 1548, 1557-58 (10th Cir. 1993).  Given the reasonable suspicions of Sergeant Bairett (which justified his request to search), the clear nature of the request, the lack of any threats or intimidation by Sergeant Bairett, and the clear and unequivocal affirmative response by Mr. Gallardo, the court concludes that Mr. Gallardo's consent was voluntary and valid under the totality of the circumstances.

15

**Was the Miranda Statement Given by Sergeant Bairett to Mr. Gallardo Adequate?**

After Sergeant Bairett handcuffed Mr. Gallardo and told him he was under arrest, he gave

the following warning to Mr. Gallardo:

> You do have the right to remain silent.  Anything you say can and will be used
> against you in court.  You have the right to an attorney.  You have the right to
> have that attorney with you during questioning.  If you give up your right to
> remain silent and choose to answer questions, you may stop answering those
> questions at any time.  Also, you may request counsel at any time during
> questioning.

(Gov't Ex. 2 (videotape) at 9:49:03-35.)  Mr. Gallardo asserts that the above warning did not

meet the requirements of Miranda v. Arizona, 384 U.S. 346 (1966), and so his statements must

be suppressed as involuntary.  According to Mr. Gallardo, the warning was defective because

"Trooper Bairett did not inform Mr. Gallardo that 'if he cannot afford an attorney one will be

appointed for him . . . .'" (Def.'s Mem. in Supp. of Mot. to Suppress at 20.)[13]

According to Miranda, the accused must be informed of the following basic rights:

> He must be warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the
> right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479 (emphasis added).  The Supreme Court elaborated on the right to an

attorney at no cost to the indigent defendant when it stated:

> In order fully to apprise a person interrogated of the extent of his rights under this
> system then, it is necessary to warn him not only that he has the right to consult
> with an attorney, but also that if he is indigent a lawyer will be appointed to

---

[13]There is no dispute that the Miranda warning was required at this point in the encounter
between Sergeant Bairett and Mr. Gallardo.  See Miranda v. Arizona, 384 U.S. 436, 478 (1966)
(warning must be given "when an individual is taken into custody or otherwise deprived of his
freedom by the authorities in any significant way and is subjected to questioning").

> represent him.  Without this additional warning, the admonition of the right to
> consult with counsel would often be understood as meaning only that he can
> consult with a lawyer if he has one or has the funds to obtain one.  The warning
> of a right to counsel would be hollow if not couched in terms that would convey to
> the indigent – the person most often subjected to interrogation – the knowledge
> that he too has a right to have counsel present.  As with the warnings of the right
> to remain silent and of the general right to counsel, only by effective and express
> explanation to the indigent of this right can there be assurance that he was truly in
> a position to exercise it.

Id. at 473 (emphasis added).  See also Michigan v. Tucker, 417 U.S. 433, 437, 447-48 (1974)

(noting that statements of accused were properly excluded because police failed to advise

accused that he would be given free counsel if unable to afford counsel himself);  Walker v.

McLain, 768 F.2d 1181, 1185 (10th Cir. 1985) (holding that failure to inform accused of his right

to appointed counsel if indigent required exclusion of the accused's statement and failure to

exclude the statement during proceeding was not harmless error).

 Miranda creates an irrebuttable presumption that when the accused is not effectively

informed of all of his rights listed in Miranda, the accused's statements must be excluded from

the prosecution's case in chief.  Oregon v. Elstad, 470 U.S. 298, 306-07 (1985).

> The Miranda exclusionary rule . . . serves the Fifth Amendment and sweeps more
> broadly than the Fifth Amendment itself.  It may be triggered even in the absence
> of a Fifth Amendment violation.  The Fifth Amendment prohibits use by the
> prosecution in its case in chief only of compelled testimony.  Failure to administer
> Miranda warnings creates a presumption of compulsion.  Consequently, unwarned
> statements that are otherwise voluntary within the meaning of the Fifth
> Amendment must nevertheless be excluded from evidence under Miranda. . . .
> Miranda's preventive medicine provides a remedy even to the defendant who has
> suffered no identifiable constitutional harm.

Id.  (emphasis in original).

 "In dealing with custodial interrogation, we will not presume that a defendant has been

effectively apprised of his rights and that his privilege against self-incrimination has been

17

adequately safeguarded on a record that does not show that any warnings have been given or that

any <u>effective alternative</u> has been employed." <u>Miranda</u>, 384 U.S. at 498 (emphasis added).  The

United States Supreme Court clarified in <u>Duckworth v. Eagan</u>, 492 U.S. 195 (1989), that courts

"need not examine <u>Miranda</u> warnings as if construing a will or defining the terms of an easement.

The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as

required by <u>Miranda</u>.'" 492 U.S. at 203 (quoting <u>California v. Prysock</u>, 453 U.S. 355 (1981)).

"We have never insisted that <u>Miranda</u> warnings be given in the exact form described in that

decision.  In <u>Miranda</u> itself, the Court said that '[t]he warnings required and the waiver necessary

in accordance with our opinion today are, in the absence of a <u>fully effective equivalent</u>,

<u>prerequisites to the admissibility</u> of any statement made by a defendant.'" <u>Id.</u> at 202 (emphasis

added) (quoting <u>Miranda</u>, 384 U.S. at 476).

 The United States contends that the warning was sufficient.  Specifically, the United

States asserts that

> while Sgt. Bairett did not use the verbatim language set forth in <u>Miranda</u>, he did
> tell the Defendant that he had "the right to have an attorney with [him] during
> questioning" and that he could "request counsel at any time during questions."
> Taken together, these statements reasonably conveyed to the Defendant that he
> has an unqualified right to have counsel with him at all points of interrogation and
> that questioning would stop immediately if he wanted an attorney.  A reasonable
> person would take this to mean that an attorney would unconditionally be
> provided for him upon that request, and that he would not be questioned without
> being provided an attorney should he request one.

(United States' Resp. to Def.'s Mot. to Suppress Evidence at 27.)

 As noted by Mr. Gallardo, the warning given to him does not expressly mention rights of

an indigent defendant or the government's duty to appoint counsel at no cost to him if he cannot

afford an attorney.  According to <u>Miranda</u>, that is one of the messages that must be

communicated to the defendant.  Nevertheless, given the <u>Duckworth</u> decision, the court must

analyze the language and relevant case law to determine whether the content of Sergeant Bairett's

warning reasonably conveys the message that if he cannot afford an attorney, one will be

appointed for him prior to any questioning, at no cost to him.  The court finds that the warning

does not reasonably convey any such message.

      The United States' proffered interpretation of the warning given to Mr. Gallardo simply

reads too much into the language and unacceptably requires that an inference be made in order to

conclude that the statement is adequate under <u>Miranda</u>.  The warning given to Mr. Gallardo was

not an "effective and express explanation" of his right to an attorney at no cost to him if he

cannot afford one.  The warning does not contain any mention whatsoever of ability to pay or

who would pay for the attorney, which the United States Supreme Court has stated is crucial to

rendering an effective warning.  Accordingly, all of Mr. Gallardo's statements made to Sergeant

Bairett, as well as subsequent statements made to officers at the jail (including Utah Bureau of

Investigation Agent Brent Dunlap and Utah Highway Patrol Trooper Ryan Bauer),[14] are not

admissible at trial.

## ORDER

      For the foregoing reasons, Defendant Jose Luis Gallardo's Motion to Suppress is GRANTED

IN PART AND DENIED IN PART.  Specifically:

      1.     The court DENIES the portion of Mr. Gallardo's Motion to Suppress that seeks

---

[14]The government must rely solely on the <u>Miranda</u> warning given by Sergeant Bairett. According to the record, no other <u>Miranda</u> warnings were given to Mr. Gallardo when he was taken to the jail for further questioning.

suppression of evidence obtained by the government during the search of the SUV.

2.      The court GRANTS the portion of Mr. Gallardo's Motion to Suppress that seeks

suppression of statements made by Mr. Gallardo.

IT IS SO ORDERED this 26th day of August, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge